[No. H009961. Sixth Dist. May 20, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ARTHUR SOUZA, Defendant and Appellant.

## COUNSEL

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COTTLE, P. J.**—After his motion to suppress evidence (Pen. Code, § 1538.5) was denied, defendant James Arthur Souza pleaded no contest to possession of methamphetamine for sale while armed with a firearm (Health & Saf. Code, § 11378; Pen. Code, §§ 12022, subd. (c), 1203.073, subd. (b)(2)), driving with a suspended or revoked driver's license (Veh. Code, § 14601.1, subd. (a)), resisting arrest (Pen. Code, § 148, subd. (a)), possession of a concealed firearm (Pen. Code, § 12025, subd. (a)), and carrying a loaded weapon in a city (Pen. Code, § 12031, subd. (a)).[1] Defendant was sentenced to four years and four months in state prison. On appeal he contends the trial court erred by denying his motion to suppress evidence seized as a result of an automobile search. For the reasons stated below, we shall affirm.

### FACTS

At approximately 6:15 p.m. on July 27, 1990, San Jose Police Officers Barnes and Craig observed defendant "driving erratically," weaving into the opposing lane of traffic as he turned from one street to the next. Concerned the driver was possibly under the influence of an alcoholic beverage or drugs, they stopped the older model Corvette defendant was driving; the stop

---

[1]A charge of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)) while armed was dismissed pursuant to a negotiated disposition.

occurred in front of 1347 Shasta Street, which was defendant's residence. Crystal Motley was sitting in the Corvette's passenger seat. Based upon defendant's driving, his fumbling through his wallet, and his nervous and "fidg[e]ty" behavior during the stop, as well as the odor of alcohol coming from the interior of the car, Barnes asked defendant to step outside and take a field sobriety test.

When Barnes first approached the Corvette, he had noticed "a torn open cardboard box of Budweiser beer and inside the box, which was torn open, was a bottle of Jose Cuervo Tequila that had been opened." Two-thirds of the contents of the bottle of tequila were missing and the tax seal had been broken. These items "were directly behind the driver's portion of the Corvette" in a "raised portion area" behind the driver's back headrest "[d]irectly up against the front seat." The Corvette had no back seat and the area where the Budweiser box was located was not an area "where you would [n]ormally find a passenger." However, Barnes testified that the beer and tequila were located "within reaching distance" of someone seated in either the driver's seat or the passenger seat of the Corvette.

After testing defendant and concluding he was not under the influence of alcohol, Barnes went into the Corvette "to retrieve the open container of liquor" "[b]ecause it is a violation of the California Vehicle Code." He moved the cardboard Budweiser box while pulling out its entire contents. He did so in order to both retrieve the open container of tequila and check whether any of the beer bottles were open because he was "concerned there might be other open containers within that carton." When the carton moved, Barnes observed an open yellow manila envelope between the box and a gym bag next to the box.

Barnes noticed that the open envelope had a large amount of cash in it and a very large plastic bag which contained an "extremely large amount" of a white powdery substance which he suspected was a "controlled substance of some type." Barnes removed the envelope from the car and approached his partner, telling him "of a violation of 11378 [possession of a controlled substance for sale] . . . ." When defendant saw the officers with the envelope, he "blurted out" that the money was his and that he did the banking for his company. At that point, both defendant and Motley started to run to the house at 1347 Shasta. The officers were able to gain physical control of defendant, but Motley ran into the house.

After "a couple minutes," Barnes and Craig followed Motley into the house through an open door. They believed she was possibly involved with the contraband found inside the Corvette. The officers searched the entire

house for Motley but did not locate her or anyone else. While in a downstairs bedroom, they observed indicia of narcotics sales, including an Ohaus gram scale and material for packaging powder-type drugs. Suspecting Motley was still inside the house, the officers secured the house and then obtained a telephonic search warrant. Once they received the warrant, they searched the house and recovered further indicia of drug sales, including a small amount of suspected methamphetamine and a large amount of cash.

It was stipulated that evidence adduced at the preliminary hearing could be considered by the superior court insofar as it was relevant to the suppression motion. That evidence revealed that Officer Craig recovered a five-shot revolver from inside the gym bag, that the cash recovered from the manila enveloped totalled $4,000, that $85,000 was recovered from a toolbox under a safe, which contained an additional $1,980, that the safe also stored a military rocket launcher and three handguns, and that the white powder in the bag was 114.75 grams of methamphetamine.

Marian Sciarrino saw the traffic stop from her living room window. She testified for the defense that, as soon as the car stopped, Motley got out and walked quickly into defendant's house. Sciarrino saw a man and woman outside when the Corvette drove up and saw the man walk into the house when Motley did. While the police were still outside the house, Motley knocked on Sciarrino's back door; upset and crying, Motley asked to use the telephone. Motley did not leave Sciarrino's house that night. Sciarrino watched defendant fall on her front lawn while the officers were standing behind him.

Defendant's neighbors, Mr. and Mrs. Robert Mercer, began watching the questioning of defendant after three to six police cars had arrived at the scene. They saw an officer reach into the car, take out a purse, and search through it. They did not mention seeing anyone besides defendant and the police.

Another neighbor, Lou Albert, testified that he saw Motley get out of the car when it pulled up in front of the house between his and defendant's. He saw Motley walk toward defendant's house but could not tell if she went inside. He saw defendant undergo a field sobriety test and saw the officer search defendant's car. Albert could not recall whether defendant was handcuffed at that point. After the search, Albert looked away momentarily. When he looked back, he saw defendant fall to the ground and heard him say, "What did I do? What are you hitting me for?" Albert did not see what caused defendant to fall, nor did he see defendant running or being tackled.

In rebuttal, Officer Craig testified that Barnes conducted the field sobriety test while Motley stood outside the car with another woman. After administering the tests, Barnes retrieved a package from defendant's car and told

Craig to "arrest Souza." At that point, defendant tried to flee. Craig could not stop him by grabbing his shirt so he hit defendant once, causing him to fall. Motley had left the scene by then, and Craig suspected she had gone into defendant's house. Based on their conversation with Motley and her friend, the officers believed Motley was in a relationship with defendant. When backup units arrived, Barnes and Craig entered the house to search for Motley. Craig estimated that they entered the house approximately five minutes after defendant was placed under arrest.

### DISCUSSION

 Defendant contends the trial court erred in denying his suppression motion. He claims Officer Barnes could not legally seize the open, one-third full, bottle of tequila because it was "stored in an area *not* normally occupied by the drive[r] or passengers." He acknowledges that this argument "turn[s] upon the application of Vehicle Code section 23225," which states, in part, that it is unlawful for the driver of a motor vehicle "to keep in a motor vehicle, when the vehicle is upon any highway, any bottle, can, or other receptacle containing any alcoholic beverage which has been opened, or a seal broken, or the contents of which have been partially removed, unless the container is kept in the trunk of the vehicle, or kept in some other area of the vehicle not normally occupied by the driver or passengers, if the vehicle is not equipped with a trunk. A utility compartment or glove compartment shall be deemed to be within the area occupied by the driver and passengers."

The trial court denied the suppression motion on the ground that the statute was intended "to keep out of the hands of the driver alcoholic beverages. It is to be stored in some place not readily accessible to the driver . . . ." The court noted its belief "that the officer acted in good faith and he had a right to do what he did." The court then added that "[d]uring the attempted seizure of the bottle, he uncovered evidence of another crime. That was in plain view, result of the investigation he was legally doing. That having come to light, the officers reasonably concluded that there was another felon in the house and something had to be done about that presently. Also, they might reasonably conclude that the other person might be occupied in attempting to destroy further evidence."

 Defendant contends that "[a]s written, . . . section 23225 *permits* a driver to carry an open container in the passenger compartment, so long as the container is not kept in an area 'normally occupied' by the driver or passengers." According to defendant's interpretation of the statute, the fact that an open container may be within easy reach of the driver is completely

irrelevant because the plain language of the statute says nothing about accessibility.

Defendant concedes his interpretation of section 23225 "yields an unusual result, for it permits trunkless cars to do what others cannot do, i.e., keep an open container in the passenger compartment of the vehicle." (See Veh. Code, § 23226.) We go one step further and agree with the trial court that defendant's interpretation of Vehicle Code section 23225 would lead to absurd results. ■ In turn, we choose not to adopt defendant's interpretation of the statute because " 'literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers.' [Citation.]" (*People* v. *Perkins* (1984) 159 Cal.App.3d 646, 650 [205 Cal.Rptr. 625].)

■■ The need for the Legislature to specify that a utility compartment or glove compartment shall be deemed to "be within the area occupied" by the driver and passengers derives from the fact that a glove compartment, like a trunk, is a closed space. The fact that the Legislature specified that a glove or utility compartment is within the restricted area for open containers, even when a car does not have a trunk, reveals its intent to make certain that open containers which contain alcohol are inaccessible to the driver and his passengers. Such specification does not automatically preclude other open areas in the passenger compartment from being considered "within the area" occupied by the driver and passengers. The obvious intent of the Legislature in enacting section 23225 was to permit individuals who drive a car without a trunk to carry an open container in the bed of a pickup truck, in a roof storage rack, or in any other similar area not normally occupied by the driver or passengers while precluding the driver and his passengers from having access to an opened alcoholic beverage container without having to stop the car and retrieve the container. From the use of the word "area" throughout the statute, it is apparent the statute prohibits an open container with an alcoholic beverage from being kept in a door, armrest, sun visor pocket, a cup holder which slides from the dashboard, a seat or floor console compartment, or, as here, an elevated area of a car directly behind the driver's seat. It would be absurd to enact a statute which makes it a crime to store an open container in a glove compartment on the passenger side of the car while legalizing such storage within arm's reach of the driver.

In a concomitant argument, defendant contends the above construction of the statute renders the statute unconstitutionally vague and violates due process notice requirements. We disagree.

We are convinced that individuals "of common intelligence" would understand that section 23225 subjected individuals inside a vehicle without a

trunk to liability if they stored an open container of an alcoholic beverage within reach of either the driver or his or her passengers. (*Connally* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) We conclude that the statute is "definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].) In turn, we reject as meritless defendant's vagueness and notice arguments.

Officer Barnes was entitled to seize the opened bottle of tequila. He was also entitled to take out the beer bottles to ascertain whether they were opened since an open container within plain view provides probable cause to believe that other open containers may be found in the vehicle. (*People* v. *Suennen* (1980) 114 Cal.App.3d 192, 202 [170 Cal.Rptr. 677].) When the process of inspecting the bottles caused their container to move and exposed an envelope filled with a large amount of money and drugs, Officer Barnes was entitled to seize the envelope as well. The fact that defendant's passenger then fled into defendant's house led to the officers' discovery of the contraband within the house.

In any event, even assuming arguendo that the raised area behind the driver's seat cannot be deemed to be within the area normally occupied by the driver and passenger, suppression is not required. The alleged mistake in determining if the open container was within the occupied area of the passenger compartment would be objectively reasonable.

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." (*Michigan* v. *Tucker* (1974) 417 U.S. 433, 447 [41 L.Ed.2d 182, 194-195, 94 S.Ct. 2357]; see also *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]; *Illinois* v. *Rodriguez* (1990) 497 U.S. 177 [111 L.Ed.2d 148, 110 S.Ct. 2793]; *Florida* v. *Jimeno* (1991) 500 U.S. 248 [114 L.Ed.2d 297, 111 S.Ct. 1801].)

The police officer was required to enforce a statute whose terms reasonably appeared to apply. Given that the trial court judge, as well as this court, interpret the language of the statute to prohibit open containers being stored where the tequila bottle was found, we can hardly deem Officer Barnes's similar conclusion to be unreasonable as a matter of law, as defendant contends.

DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 19, 1993.