Filed 10/18/24  P. v. Lark CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KAVOSIAA LARK,<br><br>    Defendant and Appellant. | C097702<br><br>(Super. Ct. No. 21FE002187) |

Defendant Kavosiaa Lark was convicted of being a felon in possession of a firearm after police discovered a handgun during a search of his car.  On appeal, Lark contends that the search of his car violated his constitutional rights and was motivated by racial bias.  He also contends that his sentence must be vacated because he did not waive his constitutional right to a jury trial on the aggravating factors that led to his upper term sentence.  Finally, he contends that his counsel provided ineffective assistance by failing

1

to appropriately challenge the search of his car, his sentence, and to pursue a motion under the California Racial Justice Act.  We affirm.[1]

## FACTUAL AND LEGAL BACKGROUND

A jury found Lark guilty of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1))[2] based on evidence that officers discovered a loaded firearm during a traffic stop.  The firearm, a TEC-9 semiautomatic handgun with a shoestring "sling," was found under the front passenger's seat within Lark's reach.  The firearm's magazine had 17 live rounds of ammunition, and the serial number had been removed.  The jury saw a video of the traffic stop and search, recorded on an officer's body-worn camera.[3]

For sentencing purposes, the prosecution alleged that Lark had suffered a prior felony conviction that qualified as a "strike" (§§ 667, subds. (b)-(i), 1170.12).  The amended information further alleged, as aggravating factors, that Lark had engaged in violent conduct that indicated a serious danger to society and had served a prior term in prison (Cal. Rules of Court, rule 4.421(b)(1), (3), respectively).[4]  Lark personally agreed to have the court determine the truth of his prior convictions and defense counsel did not object to the court conducting a bench trial on the aggravating factors.  After one combined hearing, the trial court found the alleged prior conviction and aggravating circumstances true and sentenced Lark to the upper term of three years in state prison, doubled to six years due to his prior strike.

---

[1]     The notice of appeal in this case was filed on January 4, 2023.  After multiple motions, record augmentations, extensions of time to file their briefs, and supplemental briefing, this case was fully briefed on June 18, 2024, and thereafter assigned to this panel.

[2]     Undesignated statutory references are to the Penal Code.

[3]     The video is not a part of the record on appeal.

[4]     Undesignated rule references are to the California Rules of Court.

2

# DISCUSSION

## I

## *Search and Seizure*

Prior to trial, Lark filed a motion to suppress the firearm (§ 1538.5), arguing there was no probable cause for the vehicle search. The magistrate heard the motion to suppress concurrently with the preliminary hearing and denied it. On appeal, Lark argues that counsel provided ineffective assistance when counsel failed to renew the motion to suppress, arguing again that the evidence demonstrates the search was not supported by probable cause. We disagree.

### A. *Additional Background*

At the hearing on the motion to suppress, the prosecution contended that officers had reasonable suspicion to detain Lark for the crime of driving without a valid driver's license. The prosecution also argued the search was then justified when Lark behaved suspiciously during the initial detention and officers observed an "open container" of marijuana in plain view. The prosecution alternatively argued the officers conducted a valid inventory search connected to the decision to tow Lark's car.

Officers David McDonald and Michael Bowman testified that they were working on patrol on February 2, 2021, at approximately 4:53 p.m. when they saw a silver Toyota Highlander turn into an apartment complex. The officers followed the vehicle, and Officer Bowman checked the vehicle's license plate. The driver of the Toyota double-parked behind two vehicles parked in stalls. As the officers drove past the Toyota, they saw Lark, the driver, was the only person in the Toyota.

The officers drove through the complex as they awaited the results of the records check. The officers learned that the vehicle's registration was valid; it was registered to "Kavosiaa Lark," and a photograph of Lark matched the individual driving the Toyota. The records check also revealed that Lark did not have a valid California driver's license, and he had a criminal history that included firearm possession.

The officers parked near the entrance to the apartment complex. Not long after, Lark pulled alongside the patrol car. Lark asked the officers for directions by showing them a map on his cell phone and asking them if he was in the right location. Officer McDonald noted that the map on Lark's cell phone showed them Lark's current location, but did not have a destination address typed in or a route in progress.

During the conversation, Lark admitted that he did not have a valid driver's license. Officer Bowman exited the patrol vehicle and remained on the driver's side of Lark's car while Officer McDonald positioned the patrol vehicle in front of Lark's vehicle. Officer McDonald then got out and walked to the passenger side of the Toyota. As Officer McDonald approached the car, he smelled burnt marijuana.[5]

At the officers' request, Lark turned off the vehicle's engine and removed the keys from the ignition. Shortly after, despite the fact that Officer Bowman told Lark not to, Lark put the keys back into the ignition and turned the ignition to the " 'On' position." His hands were shaking as he did so. Officer McDonald instructed Lark to remove the keys from the ignition. When Lark failed to do so, Officer McDonald, fearing Lark might flee, opened the passenger door, reached into the car, and removed the keys from the ignition. When he did so, Officer McDonald observed a marijuana blunt[6] in the ashtray. The blunt was about a half-inch long with a green leafy substance inside; it had not been completely smoked or burned and was a useable amount.

Officer Bowman testified that although Lark was initially cooperative, his demeanor changed as the contact went on, and "[h]e became very concerned, nervous, [and] had a hard time following directions." Lark was very concerned about Officer

---

[5] Officer McDonald admitted he did not include this fact in his report. Officer Bowman did not recall an odor of marijuana.

[6] Officer McDonald testified that a marijuana blunt is similar to a cigar rolled with tobacco leaves, but has marijuana inserted into it rather than tobacco.

4

McDonald and made a comment about Officer McDonald looking into the windows. Officer McDonald also described Lark as "somewhat noncompliant" and "very concerned about the vehicle." At some point in their interaction, Lark began to make a phone call and when Officer Bowman asked Lark to put the phone down, he failed to comply. When the officers asked Lark to step out of the car, Lark became argumentative. Once Lark did step out of the car, he continued to be noncompliant with the officers' directives.

The officers placed Lark in handcuffs. As the officers attempted to take Lark to the patrol car, Lark tried to kick his own driver's door closed. Officer McDonald then searched the Toyota for additional open containers of marijuana and, under the front passenger seat, found a TEC-9 pistol with 17 live rounds in the magazine. Officer McDonald testified the firearm was accessible from the driver's seat. Lark was arrested. The officers subsequently towed Lark's car because Lark had no license and the car was blocking parking stalls inside the apartment complex. An inventory search was also conducted pursuant to the decision to tow.

At the hearing, defense counsel asked Officer Bowman whether he was suspicious of Lark prior to any contact. Officer Bowman explained that Lark's behaviors in entering the complex were "interesting," including making a "quick turn" into the complex then pulling over shortly afterwards. He thought Lark was avoiding the officers. He also acknowledged that he knew Lark's criminal history prior to detaining Lark, but he explained that the possibility that Lark possessed a firearm was a concern based on Lark's behavior and demeanor.

The magistrate issued a tentative ruling that the officers had conducted "a legitimate [probable cause] search." The magistrate found that Lark's behavior warranted the officer opening the door (leading to the discovery of the blunt), the firearm found was accessible by Lark, and the stop did not take an undue amount of time. The magistrate

5

invited further argument on the issue of probable cause, stating, "I don't see any issues there."[7]

Defense counsel questioned Officer McDonald's report of the blunt and marijuana odor, arguing that Officer Bowman did not see the blunt or report smelling marijuana. Counsel also argued that Officer McDonald did not mention the odor in his report, and that rendered his testimony suspect. The magistrate expressly disagreed.

Ultimately, the magistrate found "that [Lark's] detention was legally valid, because the officers had reasonable suspicion to believe he was committing a crime, specifically, driving without a license . . . . [¶] . . . As to the main point, the Court finds that the search of [Lark's] vehicle was proper, because it was reasonable to believe evidence of the crime, specifically, open container — or a blunt marijuana in this case, would be found."

*B. Legal Background*

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. (U.S. Const., 4th Amend.) Warrantless searches are presumed to be unreasonable, and therefore illegal, subject only to a few carefully delineated exceptions. (*People v. Vasquez* (1983) 138 Cal.App.3d 995, 1000; *People v. Johnson* (2020) 50 Cal.App.5th 620, 625.) The burden is on the People to show that a warrantless search falls within one of those exceptions. (*Vasquez*, at p. 1000.)

"One such exception . . . is the automobile exception, under which an officer may search a vehicle without a warrant so long as the officer has probable cause to believe the vehicle contains contraband or evidence of a crime. [Citation.]" (*People v. Hall* (2020) 57 Cal.App.5th 946, 951.) When police officers have probable cause to believe a vehicle

---

[7]    The court also stated that it did not need to address whether the search was a legitimate inventory search in light of its belief the search was justified by probable cause.

contains contraband or evidence of criminal activity, even for a minor infraction, they may conduct a warrantless search of any area of the vehicle in which there is probable cause to believe it may be found.  (*People v. Evans* (2011) 200 Cal.App.4th 735, 753; *People v. McGee* (2020) 53 Cal.App.5th 796, 805.)  "To satisfy this requirement, probable cause to justify a warrantless search of an automobile 'must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers.'  [Citation.]"  (*People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1667; accord, *People v. Allen* (2000) 78 Cal.App.4th 445, 450.)  "In determining whether a reasonable officer would have probable cause to search, we consider the totality of the circumstances.  [Citation.]"  (*People v. Johnson, supra*, 50 Cal.App.5th at p. 625.)

  *C.  Appealability and Standard of Review*

  When a defendant's motion to suppress is denied by a trial judge sitting as a magistrate at the preliminary hearing, to preserve the issue for appeal the defendant must either renew the motion to suppress in the superior court or make a section 995 motion to dismiss the charging document.  (*People v. Lilienthal* (1978) 22 Cal.3d 891, 896-897; *People v. Hawkins* (2012) 211 Cal.App.4th 194, 199-200.)  However, a defendant's failure to preserve a Fourth Amendment claim for appeal will not preclude appellate review of the merits of the argument if the defendant asserts on appeal, as here, that his or her trial counsel was constitutionally ineffective for failing to preserve the argument.  (*People v. Hart* (1999) 74 Cal.App.4th 479, 486 (*Hart*); *Strickland v. Washington* (1984) 466 U.S. 668, 687.)  To prevail on a claim that the defendant was incompetently represented, he or she bears the burden of demonstrating that for unacceptable reasons apparent on the record, trial counsel's failure to act as a reasonably competent attorney deprived him or her of a more favorable result.  (*People v. Fosselman* (1983) 33 Cal.3d 572, 584; *People v. Harpool* (1984) 155 Cal.App.3d 877, 886.)

In reviewing the denial of a motion to suppress, we accept the magistrate's factual findings if supported by substantial evidence, but exercise our independent judgment to decide whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. Under the well-established principles of appellate review, all presumptions favor proper exercise of that power and the court's finding must be upheld if . . . it is supported by substantial evidence. [Citation.]" (*People v. Bloom* (1983) 142 Cal.App.3d 310, 316.)

### D. Probable Cause Supported the Search

Lark claims that he possessed a legal amount of marijuana, which could not give rise to probable cause for a search of his car and, thus, his counsel provided ineffective assistance by failing to renew his challenge to the search. In resolving Lark's claim, we address his argument that the record reveals that the failure to renew the challenge was unacceptable because the motion had merit. We conclude that the search of the car was supported by probable cause and, alternatively, the firearm would inevitably have been discovered during a valid impound and inventory search. Thus, counsel was not ineffective for failing to renew the challenge.

In 2016, the voters passed Proposition 64, the "Control, Regulate, and Tax Adult Use of Marijuana Act," which legalized the possession of small amounts of marijuana for personal use. (*People v. Johnson, supra*, 50 Cal.App.5th at p. 625 & fn. 3.) Under Health and Safety Code section 11362.1, subdivision (a)(1), it is lawful for persons 21 years or older to possess and transport up to 28.5 grams of cannabis. (Health & Saf. Code, § 11362.1, subd. (a)(1).) Subdivision (c) of that statute further provides that "[c]annabis and cannabis products involved in any way with conduct deemed lawful by this section are not contraband nor subject to seizure, and no conduct deemed lawful by

this section shall constitute the basis for detention, search, or arrest." (Health & Saf. Code, § 11362.1, subd. (c).)

But Health and Safety Code section 11362.1, subdivision (c) only applies to conduct "deemed lawful" under that section. (See *People v. Moore* (2021) 64 Cal.App.5th 291, 300.) Thus, while possession of a lawful amount of marijuana alone is insufficient to establish probable cause, it may support a finding of probable cause if it is coupled with other factors contributing to a reasonable belief that the vehicle contains contraband or evidence of criminal activity. (*Ibid.*; *Blakes v. Superior Court* (2021) 72 Cal.App.5th 904, 911-912.) For example, even after the passage of Proposition 64, it is unlawful to possess or transport more than 28.5 grams of cannabis (Health & Saf. Code, § 11362.1, subd. (a)(1)); to smoke or ingest cannabis while driving or riding in the passenger seat of a vehicle (Health & Saf. Code, § 11362.3, subd. (a)(7), (8)); to possess an open container of marijuana while operating a vehicle (Health & Saf. Code, § 11362.3, subd. (a)(4)); or to drive a vehicle while under the influence of any drug (Veh. Code, § 23152, subd. (f)). It follows that a warrantless vehicle search will be justified where the presence of a lawful amount of marijuana, combined with other suspicious facts or circumstances, gives the police officer reasonable grounds to believe the suspect has an illegal amount of marijuana or is violating some other marijuana regulation.

At the hearing on the motion to suppress, the evidence supported probable cause to believe illegal uses of marijuana were occurring, namely driving under the influence of marijuana (Health & Saf. Code, § 11362.3, subd. (a)(7)) and driving with an open container of marijuana in the passenger area of the car (Health & Saf. Code, § 11362.3, subd. (a)(4)).

With respect to driving under the influence of marijuana, Lark argues that there was no evidence that Lark had recently smoked marijuana or was driving erratically, which would suggest he was under the influence. While signs of actual impairment provide additional support for probable cause to believe someone is driving under the

9

influence, it is not a necessary prerequisite. Here, other factors and behavior by Lark gave rise to probable cause. Officer McDonald testified that he smelled burnt marijuana as he approached the car and he saw a half-burnt marijuana blunt in the car, suggesting recent use. Lark was very nervous, his hands were shaking, and he had a hard time following the conversation and other directions, further suggesting he might be impaired.

Although Lark questions the veracity of Officer McDonald's testimony regarding the odor of marijuana, such a credibility determination was left to the magistrate. Here, the magistrate explicitly rejected defense counsel's argument that Officer McDonald's testimony that he smelled burnt marijuana was suspect. Substantial evidence supports this credibility determination. There was little evidence that either officer was not credible. Their respective testimonies were not inherently implausible, and they were not significantly impeached. We see no reason to upset the credibility determination made by the magistrate.

In this regard, we find *People v. Fews* (2018) 27 Cal.App.5th 553 instructive. In *Fews*, an officer conducting a traffic stop smelled " 'recently burned marijuana' " emanating from the car and observed a "half-burnt, flattened, and rerolled cigar" that contained marijuana. (*Id*. at p. 557.) The officer searched the vehicle and conducted a patsearch of the defendant, a passenger, and found a firearm in the defendant's pocket. (*Id*. at p. 558.) On appeal, the appellate court concluded the search of the car was supported by probable cause, as was the decision to patsearch the defendant. The court concluded "the evidence of the smell of 'recently burned' marijuana and the half-burnt cigar containing marijuana supported a reasonable inference that [the driver] was illegally driving under the influence of marijuana, or, at the very least, driving while in possession of an open container of marijuana." (*Id*. at p. 563.)

So too here, as the marijuana blunt in plain view was sufficient to provide reasonable grounds to believe Lark was transporting marijuana in an open container. The cases relied on by Lark do not convince us otherwise. For example, in *People v. Lee*

10

(2019) 40 Cal.App.5th 853, the defendant could not produce his license during a traffic stop and officers conducted a patdown. During the patdown, one officer found a bag containing a lawful amount of marijuana in the defendant's pocket along with money. (*Id*. at p. 857.) The officer "acknowledged that the small bag of marijuana in [the defendant's] pocket contained an amount consistent with personal use and was not illegal on its own." (*Id*. at p. 859.) In reviewing the validity of the search, the appellate court agreed that "possession of a small (legal) amount of marijuana does not foreclose the possibility that defendant possesses a larger (illegal) amount," but concluded the warrantless search was not justified as there must be "*additional* evidence beyond the mere possession of a legal amount — that would cause a reasonable person to believe the defendant has more marijuana." (*Id*. at p. 862.) Unlike in *Lee*, officers here had other factors, as detailed above, that supported their decision to search Lark's car.

In *People v. Johnson, supra*, 50 Cal.App.5th at page 627, the court found a warrantless search based on officers' probable cause to believe the defendant was operating a vehicle with an open container of marijuana (Health & Saf. Code, §11362.3, subd. (a)(4)), or driving a vehicle with an unsecured container of marijuana (Veh. Code, §23222, subd. (b)) was not justified where there was no evidence of the defendant's driving, as the defendant was parked on the side of the road when officers first came upon him. (*Johnson*, at p. 631.) Those are not the facts before us.

Finally, Lark cites *People v. Shumake* (2019) 45 Cal.App.5th Supp.1, from the superior court's appellate division — which is not binding on us (*Velasquez v. Superior Court* (2014) 227 Cal.App.4th 1471, 1477, fn. 7), and is factually inapposite. In *Shumake*, the smell of burnt marijuana was detected during a traffic stop. The officer searched the car and found a closed plastic tube containing marijuana. (*Id.* at p. 4.) The court determined that under those circumstances, there was not a "fair probability" that the officer would find evidence of a crime and the search was not justified. (*Id.* at p. 8.) Yet again, the facts in *Shumake* lack the other factors giving rise to probable cause that

11

we see here — nervousness, failure to follow directions, difficulty tracking conversation, argumentative demeanor.

In contrast, Lark had a partially burnt marijuana blunt in plain view, rather than in a container in his pocket as in *Lee*, a knotted plastic bag as in *Johnson*, or in a closed plastic tube as in *Shumake*. Although Lark attempts to characterize the blunt as closer to remnants or trash, the facts do not support such a characterization. The blunt was about a half an inch long and contained a green, leafy substance that, as Lark admits, was a useable amount. The evidence supports the inference that the blunt was being saved for future use rather than being discarded. We have no difficulty concluding that the marijuana blunt with visible leafy substance gave rise to reasonable suspicion that Lark was transporting marijuana openly, rather than in a container. In this respect, we find *In re Randy C.* (2024) 101 Cal.App.5th 933 instructive.

In *In re Randy C.*, an officer conducted a traffic stop of a car driven by a minor. When the officer approached, he noticed the smell of unburnt marijuana coming from inside the vehicle. He also saw an adult passenger in the car who appeared to have a " 'marijuana blunt' " on his lap. The marijuana appeared to be a usable amount, was not burned or smoked, and was not in a closed container. (*In re Randy C., supra*, 101 Cal.App.5th at p. 938.) The appellate court concluded that the subsequent search of the car was valid, as the officer had probable cause based on the marijuana being transported in an open container in violation of Health and Safety section 11362.3, subdivision (a)(4). The court found that this "open container of marijuana was contraband that, along with the smell of unburnt marijuana emanating from the vehicle, provided probable cause to believe minor or his passenger may also have possessed additional marijuana" in violation of the law. (*Randy C.*, at p. 940.) The court found that, "The plain and commonsense meaning of an 'open container' is one in which there is no barrier to accessing the marijuana contained inside." (*Id*. at p. 941, citing *People v. Johnson, supra*, 50 Cal.App.5th at p. 633 [concluding a knotted plastic baggie is not

12

"open" because the knot "presents a barrier to accessing the content"].) The court found that the paper wrapping of the blunt, enclosing the marijuana, presented no barrier to accessing the marijuana. (*Randy C.*, at p. 941; see also *People v. Fews, supra*, 27 Cal.App.5th at pp. 563-564 [probable cause to justify a vehicle search where the odor of marijuana was present and the fact that the driver was holding a half-burnt cigar containing marijuana supported a reasonable inference that the driver was driving while in possession of an open container of marijuana]; *People v. Souza* (1993) 15 Cal.App.4th 1646, 1653 [an open container within plain view provides probable cause to believe that other open containers may be found in the vehicle]; *People v. McGee, supra*, 53 Cal.App.5th at p. 804 [presence of an open container of marijuana provided probable cause to believe other open containers may be found in the vehicle]; cf. *People v. Hall, supra*, 57 Cal.App.5th at pp. 958-959 [officer lacked probable cause to search vehicle where there was no evidence the plastic bag containing marijuana in the center console was open and not sealed or that the loose marijuana on the driver's lap was a usable amount].)

We thus conclude the search of the car was supported by probable cause.

*E. Discovery of the Firearm was Inevitable Through an Impound and Inventory Search*

We also conclude that even if the search were unlawful, suppression of the firearm is unwarranted because the firearm inevitably would have been discovered pursuant to a valid impound and inventory search.

Under the inevitable discovery doctrine, where the prosecution can establish by a preponderance of the evidence that the information would inevitably have been discovered by lawful means, the exclusionary rule does not apply. (*Nix v. Williams* (1984) 467 U.S. 431, 443-444; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62; *People v. Robles* (2000) 23 Cal.4th 789, 800-801.) "As the United States Supreme Court has explained, the doctrine 'is in reality an extrapolation from the independent source

13

doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' [Citation.]" (*Robles*, at p. 800, italics omitted.)

Inventory searches of police-impounded cars are "a well-defined exception to the warrant requirement of the Fourth Amendment." (*Colorado v. Bertine* (1987) 479 U.S. 367, 371.) The Supreme Court has recognized that police officers have a legitimate interest in taking an inventory of the contents of vehicles they legally impound "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." (*Id*. at p. 372.) Nonetheless, it is well established that an inventory search must not be a "ruse for a general rummaging in order to discover incriminating evidence." (*People v. Williams* (1999) 20 Cal.4th 119, 126.)

"To determine whether a warrantless search is properly characterized as an inventory search, 'we focus on the purpose of the impound rather than the purpose of the inventory.' [Citation.]" (*People v. Lee, supra*, 40 Cal.App.5th at p. 867.) " '[A]n inventory search conducted pursuant to an unreasonable impound is itself unreasonable.' [Citation.]" (*People v. Torres* (2010) 188 Cal.App.4th 775, 786.) California law also authorizes a vehicle impound when the driver does not have a valid driver's license (Veh. Code, § 12500, subd. (a)). (Veh. Code, §§ 14602.6, subd. (a)(1), 22651, subd. (p).)

Here, Lark admitted he did not have a valid license. Thus, the officers were statutorily authorized to impound the vehicle. Statutory authorization, however, does not end our inquiry. "Just as inventory searches are exceptions to the probable cause requirement, they are also exceptions to the usual rule that the police officers' '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.' " (*People v. Torres, supra*, 188 Cal.App.4th at p. 787.) "[C]ourts will explore police officers' subjective motivations for impounding vehicles in inventory search cases,

14

even when some objectively reasonable basis exists for the impounding." (*Id*. at pp. 787-788.)

"[A]s the United States Supreme Court has explained, inventory search cases apply 'the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime." ' [Citation.] [¶] And so courts invalidate inventory searches when the police impound vehicles without serving a community caretaking function, suggesting the impoundings were pretexts for conducting investigatory searches without probable cause." (*People v. Torres, supra*, 188 Cal.App.4th at p. 788.)

Lark argues that because there was no evidence regarding standardized procedures for impound searches, we cannot presume the inventory search would have been conducted to produce an inventory rather than to conduct an investigatory search without probable cause. But Lark places too much emphasis on the lack of a departmental impound procedure. To be reasonable, an impound must be conducted pursuant to a standardized procedure, not a specific departmental procedure. (*People v. Torres, supra*, 188 Cal.App.4th at p. 787.) The officers subsequently towed Lark's car because Lark had no license, and the car was blocking parking stalls inside the apartment complex. Authority provided by the Vehicle Code, which when considered with concerns regarding access to private property, provides the standard procedure preventing the officers from exercising unfettered discretion. (See *People v. Redd* (2010) 48 Cal.4th 691, 721; *People v. Suff* (2014) 58 Cal.4th 1013, 1056; see also *People v. Aguilar* (1991) 228 Cal.App.3d 1049, 1053 [court focuses on the purpose of the impound rather than the purpose of the inventory].)

15

We conclude the search was justified by probable cause and the firearm inevitably would have been discovered pursuant to a valid impound and inventory search. Accordingly, Lark has failed to persuade us that, had counsel renewed the suppression motion, a reasonable probability exists that the result of the proceeding would have been different. (See *People v. Turner* (1992) 7 Cal.App.4th 1214, 1219 ["Counsel has no duty to make his client happy by interposing useless suppression motions"].)

II

*Aggravating Factors at Sentencing*

Lark contends that his sentence must be vacated because he did not waive his federal constitutional right to a jury trial on the aggravating factors used to justify his upper term sentence. He also complains that counsel provided ineffective assistance by failing to object to the court's factual findings as unsupported by the evidence. We agree Lark did not waive his right to a jury trial on the aggravating factors, but we do not find that to be error and, even if we had, we disagree he is entitled to sentencing relief.

*A. Additional Background*

Before the jury returned a verdict on the underlying charge in this case, the trial court advised Lark of his right to a jury trial on the prior conviction allegation. The court explained that the prosecution had to prove beyond a reasonable doubt that he was convicted of robbery in 2014, as alleged. The prosecution confirmed it had a certified copy of the conviction and the court further explained that Lark had a choice of trier of fact: he could have a jury or the court determine whether that certified copy of the conviction proved the allegation. All parties, including Lark personally, agreed to waive a jury trial on the allegation that Lark had sustained a prior strike conviction.

Defense counsel further agreed to have the court conduct a court trial on the truth of the prior conviction and aggravating factors at the sentencing hearing. However, the trial court did not obtain a personal waiver from Lark regarding his right to a jury trial on the aggravating factors.

16

At the hearing on the prior convictions, the prosecutor offered four exhibits into evidence: the certified record of Lark's 2014 conviction in Sacramento County Superior Court case No. 13F017552 for armed robbery with a firearm enhancement (§§ 211, 12022.53, subd. (b) (exhibit No. 9)); the certified record of Lark's 2017 conviction in Sacramento County Superior Court case No. 16FE012481 for being a felon in possession of a firearm with a prior strike conviction (§§ 29800, subd. (a), 667, subds. (b)-(i), 1170.12) (exhibit No. 10), as well as a "section 969b packet" for that 2017 conviction (exhibit No. 12); and a certified copy of Lark's "RAP" sheet (exhibit No. 11).

Based on these exhibits, the trial court found true that Lark had sustained a prior strike conviction for robbery on or about April 10, 2014, as alleged. Additionally, the trial court found true the aggravating factors that Lark had engaged in violent conduct, indicating he was a serious danger to society (rule 4.421(b)(1)), and that Lark had served a prior prison term (rule 4.421(b)(3)). In making these findings, the trial court observed that the exhibits offered in support of Lark's prior strike conviction showed that Lark had previously been convicted of being a felon in possession of a firearm and had received a 32-month state prison sentence — which was the same offense as the instant conviction.

The prosecutor requested a midterm sentence, doubled because of Lark's prior strike. Defense counsel advocated for the probation officer's recommendation: a low term sentence, doubled due to the prior strike. The trial court instead chose to impose an upper term sentence for the following reasons: "I've looked over the defendant's prior record as indicated in the probation report. The defendant was arrested and convicted in 2014 for a robbery with a gun. He received probation for that, and received a 365-day county jail sentence. [¶] While on probation, it looks like he received the next conviction, which was, once again, the defendant with a gun in 2017. He received 32 months, that is a low term sentence on that case, probably because his prior case, he had only received probation, he had never been to prison before. [¶] And now here, we are in this case and the defendant was found with a Tec-9, and he had — with an extended

17

magazine, 17 live rounds in the magazine, and the serial number was erased from the firearm. So obviously, low term does not seem to be an appropriate sentence in this case. Really, the only mitigation is that his prior was older than five years, as listed under B-13, according to the probation report. [¶] But the aggravating circumstance in this case that has been found true by the Court that most impacts the Court's view on this, is the defendant has served a prior prison term. He served a prior prison term for this exact same violation, that is a violation of Penal Code Section 29800. Being convicted of a felon, and then he had a gun and was sentenced to prison. Apparently, had no impact on the defendant at all . . . . [¶] . . . [S]o I can't see in any world that this is a low term case. [¶] . . . I can't see this as a midterm case. This is a defendant — this is the third time he's had a firearm . . . . And you have, of course, the aggravating circumstance that he had this prior prison term. [¶] So based on the prior — that particular aggravating circumstance of having been in prison on a prior occasion, the Court is going to find that an upper term sentence is warranted. The interest of public safety is very high in this case. The defendant's clearly a threat to the public safety, cause every time he seems to get in trouble with law enforcement, he has a firearm. And he does not seem to be getting the message that he cannot have a firearm when he's a convicted felon. [¶] So it is the judgment and sentence of the Court that for a violation of Penal Code section 29800, the defendant be committed to state prison for the upper term of three years, that term will be doubled because of his strike prior, for a total of six years in state prison."

*B. Analysis*

The error in the court's pronouncement of the upper term sentence, argues Lark, is not only were the aggravating circumstances not permissibly proven, but also that the trial court's reliance on the aggravating factor that he was a threat to public safety was factually unsupported. Thus, he contends he is entitled to have his sentence vacated and the matter remanded for resentencing. Based on the record before us, we disagree.

18

"[E]xcepting prior convictions and in the absence of a waiver or stipulation, aggravating facts relied upon to justify an upper term must be resolved by the jury beyond a reasonable doubt." (*People v. Lynch* (2024) 16 Cal.5th 730, 755.) Historically, "facts regarding prior prison terms have been held not to implicate a constitutional right to a jury under Sixth Amendment principles. (See [*People v. ]Towne* [(2008)] 44 Cal.4th [63,] 81, ['trial court's conclusion that the charged offense was committed while the defendant was on probation or parole, like a finding of a prior conviction, does not require judicial factfinding'].)" (*People v. Falcon* (2023) 92 Cal.App.5th 911, 954, review granted Sept. 13, 2024, S281242, disapproved in part in *Lynch, supra*, 16 Cal.5th 730.) The high court's decision in *Erlinger v. United States* (2024) 602 U.S. ___ [144 S.Ct. 1840] recently interpreted the scope of the prior conviction exception, rejecting the argument that the exception "permits a judge to find perhaps any fact related to a defendant's past offenses, including whether he committed them on different occasions" within the meaning of the Armed Career Criminal Act of 1984 (18 U.S.C. § 924(e)). (*Erlinger*, at p. ____ [144 S.Ct. at p. 1853].) Instead, "a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' " (*Id*. at p. ____ [144 S.Ct. at p. 1854], quoting *Mathis v. United States* (2016) 579 U.S. 500, 511-512.) The court noted that to determine the legal elements attached to prior convictions the court may need to consult the relevant admissible documents to ascertain the jurisdiction and date of occurrence. But the court emphasized a judge may not use information in otherwise permitted documents "to decide 'what the defendant . . . actually d[id],' or the 'means' or 'manner' in which he committed his offense in order to increase the punishment to which he might be exposed." (*Erlinger*, at p. ____ [144 S.Ct. at p. 1855].)

Here, to determine whether Lark served a prior prison term, the court was provided with several certified records, admissible for the purpose of proving a prior conviction and service of a prison term. Specifically, the court reviewed the certified

19

copy of records from the Department of Corrections and Rehabilitation, which, pursuant to section 969b, established a prima facie case that Lark served a prison term. The court also reviewed certified court records of convictions and associated prison sentences. These court records were admissible under the exception to the hearsay rule set forth in Evidence Code section 452.5, subdivision (b)(1) to show that Lark committed the crimes reflected in the records of conviction and to prove any "prior conviction, service of a prison term, or other act, condition, or event recorded by the record." (Evid. Code, § 452.5, subd. (b)(1).) Finally, the court reviewed the submitted RAP sheet, also known as a CLETS printout, which listed prior convictions and sentences. (See *People v. Martinez* (2000) 22 Cal.4th 106, 134 [concluding that a trial court may admit and consider a CLETS printout under the official records exception to the hearsay rule].)

Not only is the consideration of the certified records specifically contemplated by statute to establish proof of a prior prison term, we conclude this does not offend constitutional law. The concern in *Erlinger* was that a court may not engage in factfinding as to the details of the means or manner of commission of a defendant's prior conviction. We have no such concern here. Whether a defendant served a prior prison term involves no factual finding whatsoever. Indeed, it does not even require consultation of criminal statutes as might be necessary in determining the elements of the offense — a permissible activity under *Erlinger.* Thus, we find no error in the court's finding the truth of, and reliance on, Lark's prior prison term in imposing an upper term sentence.

As Lark points out, however, the court also made several comments about firearm possession. The court found Lark had been convicted in 2014, of "a violation of Penal Code Section 211," and when sentencing Lark in the current case, the court referred to that conviction as "robbery with a gun." After noting that Lark was convicted and sent to prison in 2017 for the felon in possession of a firearm conviction, the court stated "this is the third time he's had a firearm, and he had the robbery case, which is, of course, the

20

strike, and then the [section] 29800 just from 2017." As the People conceded at oral argument, while Lark was initially charged in 2014 with robbery with the use of a firearm, he ultimately entered a plea to the robbery, but the firearm allegation was dismissed. Thus, Lark was not *convicted* of the use of a firearm as attached to the 2014 robbery. Lark argues this is significant because the trial court based its upper term sentencing selection, in part, on the aggravating circumstance that Lark presented a serious danger to society by having been convicted of multiple offenses wherein he had a firearm. The fact that the trial court was incorrect, at least as to the 2014 robbery conviction, Lark contends, means the court's reliance on the aggravating circumstance under rule 4.421(b)(1) was erroneous.

We believe Lark misinterprets the trial court's basis for imposing the upper term sentence in this case. While the trial court's record is certainly cloudy, we find the court's statements regarding Lark's prior prison term as the basis for the upper term sentence are clear and unequivocal. The trial court indicated: "But the aggravating circumstance in this case that has been found true by the Court *that most impacts the Court's view on this*, is the defendant has served a prior prison term. He served a prior prison term for this exact same violation, that is a violation of Penal Code Section 29800. Being convicted of a felon, and then he had a gun and was sentenced to prison." (Italics added.) Moreover, after noting "this is the third time he's had a firearm," the court stated: "*And you have, of course, the aggravating circumstance that he had this prior prison term. [¶] So based on the prior —- that particular aggravating circumstance of having been in prison on a prior occasion, the Court is going to find that an upper term sentence is warranted.* The interest of public safety is very high in this case. The defendant's clearly a threat to the public safety, cause every time he seems to get in trouble with law enforcement, he has a firearm. And he does not seem to be getting the message that he cannot have a firearm when he's a convicted felon." (Italics added) We do not interpret the trial court's reference to Lark being a threat to public safety as indicative of its reliance on a rule

21

4.421(b)(1) factor to justify its selection of the upper term. Rather, we conclude the court's statement demonstrates a reliance on Lark's prison prior as the basis for justifying the upper term sentence.

Because section 1170, subdivision (b)(3) explicitly permits a trial court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury," and the record on appeal includes such certified records to support the court's reliance on the rule 4.421(b)(3) factor, we find no error occurred.

In an abundance of caution, and noting that the California Supreme Court has granted review in *People v Wiley* (2023) 97 Cal.App.5th 676, review granted March 12, 2024, S283326 to consider the issue of whether the sentencing court's consideration of circumstances in aggravation based on certified records of prior conviction, beyond the bare fact of the convictions, violates section 1170, subdivision (b)(3) or the defendant's Sixth Amendment right to a jury trial, we proceed to analyze whether Lark was prejudiced by the trial court's failure to submit the matter of the aggravating circumstance of Lark's prior prison term to a jury, or secure his stipulation thereto.

Pursuant to the Supreme Court's recent decision in *People v. Lynch, supra*, 16 Cal.5th 730 we will assess prejudice under the *Chapman* standard of review. (*Chapman v. California* (1697) 386 U.S. 18.) Thus, we will determine whether, beyond a reasonable doubt, a jury, applying that same standard, would have found true the prior prison term allegation alleged in this case. We determine it would have. As discussed above, several certified, admissible documents demonstrated the existence of his prior convictions and prior prison term, and Lark did not dispute the existence of either. Thus, we conclude beyond a reasonable doubt that the jury would have found the aggravating circumstance that Lark served a prior prison to be true.

Because Lark's claims with respect to the sentence are without merit, his trial attorney's failure to object did not cause counsel's performance to fall below objective

22

standards of professional competence, and Lark's claim of ineffective assistance of counsel fails. (*Strickland v. Washington, supra*, 466 U.S. at p. 688; *People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

III

*Racial Justice Act*

The day after Lark's appellate counsel filed the opening brief with this court, counsel filed a separate "Motion for Judicial Notice, Stay of Appeal, and Remand to Superior Court under Racial Justice Act." Through this motion, Lark requests that we find he has made a prima facie showing of a violation of section 745, subdivision (a), because the officers in this case showed a racial bias toward Lark when they decided to conduct a traffic stop and search his car. He also requests that we take judicial notice of a report regarding the city's policing statistics. Finally, he requests that we order the appeal stayed, and remand the cause to the superior court for further proceedings on his racial bias claims. The People opposed the motion. We deferred ruling on the motion and allowed supplemental briefing on the Racial Justice Act claim.

  *A. Legal Background*

In enacting the California Racial Justice Act (RJA) through section 745, the Legislature declared its intention to eliminate racial bias in criminal proceedings. Subdivision (a) of section 745, provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." Pertinent to our discussion, a violation of section 745 is established if the defendant shows that "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).)

Subdivision (b) of section 745 informs defendants how to seek relief during various stages of a criminal proceeding. As originally enacted, effective January 1, 2021,

23

defendants could seek relief by filing "a motion in the trial court or, if judgment ha[d] been imposed, [by filing] a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a)." (Former § 745, subd. (b).)  When enacted, section 745 applied only prospectively to cases in which judgment had not been entered prior to January 1, 2021.  (Stats. 2020, ch. 317.) Therefore, in all eligible cases — including Lark's case — the defendant had the opportunity to raise a RJA claim in the trial court.

Effective January 1, 2024, the Legislature amended subdivision (b) through Assembly Bill No. 1118 (2023-2024 Reg. Sess.).  Section 745, subdivision (b) now provides:  "A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a).  For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence.  The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section.  If the motion is based in whole or in part on conduct or statements by the judge, the judge shall disqualify themselves from any further proceedings under this section."

Section 745 also instructs the trial court upon the filing of a motion.  If "the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing.  A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.  A motion that is not timely may be deemed waived, in the discretion of the court."  (§ 745, subd. (c).)  Ultimately, the defendant has the burden of proving a violation of subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination.  (§ 745, subd. (c)(2).)

### B.  Forfeiture

The People argue that Lark's claims under the RJA are forfeited, as explained by *People v. Lashon* (2024) 98 Cal.App.5th 804.  Lark acknowledges that the *Lashon* court

has determined that the traditional rules of forfeiture apply to RJA claims but urges us to reject the reasoning in that case. Lark contends the *Lashon* court misinterpreted the amendment to subdivision (b), which, through its plain language, now allows RJA claims to be raised on direct appeal for the first time if supported by the trial record. Alternatively, he urges us to exercise our discretion and to consider the merits of his argument or to consider the merits of his RJA claim through the lens of his counsel's ineffectiveness by failing to file a motion pursuant to section 745.

In *Lashon*, the appellate court held that an RJA claim may be deemed forfeited on direct appeal if such a claim could have been raised below but it was not asserted in the lower court when the defendant had a chance to do so. (*People v. Lashon, supra*, 98 Cal.App.5th at p. 813.) *Lashon* examined the statutory language of the RJA, and its legislative history. It saw no evidence of a legislative intent "to strip the courts of their discretionary authority to determine whether a[n RJA] claim is reviewable on direct appeal where the claim could have been but was not presented in the trial court." (*Lashon*, at pp. 814-815.) We agree with the *Lashon* court's reasoning and conclude where, as here, the defendant could have but failed to raise his or her RJA claim below, it is forfeited.

Nevertheless, because Lark alleges his counsel provided ineffective assistance by failing to raise an RJA claim — as supported by the record — we must examine the merits of Lark's RJA claim. (See *People v. Singh* (2024) 103 Cal.App.5th 76, 116-117 [finding the RJA claim subject to the appellate rules of forfeiture but addressing the issue through the lens of an ineffective assistance of counsel claim].)

*C. Analysis*

At the prima facie stage, a defendant must state fully and with particularity the facts on which relief is sought, and the court should accept the truth of the defendant's allegations, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. The

court should not make credibility determinations at the prima facie stage. (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23.) In determining whether the defendant has made a prima facie showing under the RJA, "the court asks if a defendant has proffered facts sufficient to show a 'substantial likelihood' — defined as 'more than a mere possibility, but less than a standard of more likely than not' — that the Racial Justice Act has been violated. (§ 745, subd. (h)(2).)" (*Finley*, at p. 22.)

Lark relies on the following combination of facts from the transcript of the preliminary hearing: (1) Officer Bowman ran his car's license plate despite the fact that Lark had done nothing wrong or patently suspicious; (2) even after discovering nothing amiss with the license plate, Officer Bowman conducted a driver's license check on him, which cannot be justified by any logical, nonracially biased reason; (3) Officer McDonald detained Lark to discuss his license status by blocking his car with the patrol car, an "extreme" measure for a violation of Vehicle Code section 12500, and one that was unjustified by Lark's conduct; (4) the search of his car was based upon the discovery of a discarded half-inch butt of a marijuana cigarette, despite evidence that the officers did not see him smoking marijuana and did not suspect him of driving under the influence of marijuana; and (5) Lark appears to have been the victim of the discriminatory practice of "racial or identity profiling," in violation of section 13519.4, subdivisions (e) and (f), in that the officers considered his race, color, ethnicity, and age in deciding to detain and subsequently search him.

The question before us is whether Lark has made a prima facie showing, as defined by the RJA, that he was targeted for the initial encounter based on his race. We conclude he has not; there is no indication from the preliminary hearing that the officers targeted Lark because of his race, color, or ethnicity. First, Lark admits he was properly detained based on his lack of a valid driver's license. Nevertheless, he claims without support, that the officer's act of positioning the patrol car in front of Lark's car to effectuate the detention was "extreme." Under the circumstances of this case, we

26

disagree. Lark pulled up to the officers and admitted he was driving without a license. The officer's decision to physically block Lark's car from further travel was reasonable to prevent Lark from continuing to break the law. Even if we were to assume that such a maneuver was "extreme" as Lark claims, there is no indication that it was done as a result of express or implicit animus toward him based on race. And, as we have previously concluded, the subsequent search of Lark's car was justified by probable cause.

Additional evidence presented at the hearing on the motion to suppress supports our conclusion. Specifically, defense counsel asked Officer Bowman whether he was suspicious of Lark prior to any contact. Officer Bowman explained that Lark's behavior in entering the complex was "interesting" and that he thought Lark was "avoid[ing]" the officers when he made a quick turn into the apartment complex. However, there was no evidence that the officers saw Lark or could make any observations about the race or ethnicity of the driver at that point. While the officers ran the records check, they drove by Lark and observed him but did not make contact with him. Shortly after learning Lark did not have a valid driver's license, Lark approached the officers. Lark's subsequent behaviors of acting nervous, disobeying the officers' request to keep the car turned off, and difficulty in following directions prompted the officers' responses that led to the discovery of the blunt and, ultimately, the firearm. Thus, the evidence presented does not support, and instead contradicts, Lark's otherwise conclusory claims that there was no nonracial reason as to why he was detained or that he was a victim of racial profiling. (See § 745, subd. (h)(1) ["Race-neutral reasons shall be relevant factors to charges, convictions, and sentences that are not influenced by implicit, systemic, or institutional bias based on race, ethnicity, or national origin"].) On this record, we find no evidence to support a prima facie showing of racial animus.

Lark claims that the "National Justice Database City Report" for the city's police department pertaining to the years 2014 to 2019 supports his claim of racial bias by the officers in this case and asks us to take judicial notice of this report pursuant to Evidence

27

Code section 452, subdivision (h). We decline to do so. "Judicial notice under Evidence Code section 452, subdivision (h) is intended to cover facts which are not reasonably subject to dispute and are easily verified. These include, for example, facts which are widely accepted as established by experts and specialists in the natural, physical, and social sciences which can be verified by reference to treatises, encyclopedias, almanacs and the like or by persons learned in the subject matter. [Citation.]" (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145.) Whatever statistics the report purports to provide, they do not constitute facts that are "not reasonably subject to dispute" because, contrary to Lark's claim, the *accuracy* of the report may not be verified by going to the city's Web site where it is posted, only the *existence* of the report may be so verified. Thus, the statistics and figures set forth in the report are not "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).)

We also agree with the People that, because the report is not part of the trial record, we cannot consider it. Pursuant to rules of appellate procedure, and indeed under the plain terms of section 745, subdivision (b), the RJA claim must be based on the trial court record. (See *People v. Bean* (1988) 46 Cal.3d 919, 944 ["The scope of an appeal is limited to the record of the proceedings below"].)

While we take seriously the Legislature's "primary motivation" for the RJA is "to afford meaningful relief to victims of unintentional but implicit bias" (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828, italics omitted), the act still requires a defendant to proffer facts sufficient to show a "substantial likelihood" that the RJA has been violated. (§ 745, subd. (h)(2).) Lark does not meet his burden to establish that a violation of the RJA occurred. This record does not demonstrate or even reasonably suggest that the officers "exhibited bias or animus towards [him] because of [his] race, ethnicity, or national origin." (§ 745, subd. (a)(1).) Accordingly, we deny his request to

28

stay the appeal and remand the cause to the trial court for further proceedings under the RJA.

## DISPOSITION

The judgment is affirmed.

/s/
EARL, P. J.

We concur:


/s/
ROBIE, J.


/s/
RENNER, J.